**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE LINERBOARD ANTITRUST LITIGATION** | ) ) ) | **MDL No. 1261** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | |
| **Procter & Gamble Company, et al. v. Stone Container Corporation, et al.** | ) ) ) | Case No. 03C-3944 (N.D. Ill.) |
| **Mars, Inc., et al. v. Stone Container Corporation, et al.** | ) ) ) | Case No. 03C-6977 (N.D. Ill.) |
| **Perdue Farms, Inc. v. Stone Container Corporation, et al.** | ) ) ) | Case No. 03-CV-1702 (D. Md.) |

**DuBOIS, J.**                                                      **AUGUST 30, 2007**

## TABLE OF CONTENTS

MEMORANDUM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    III.   DISCUSSION: STATUTES OF LIMITATIONS. . . . . . . . . . . . . . . . . . . . 5
         A.    Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            1.    The Class Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            2.    The Direct Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            3.    Tolling of the State Statutes of Limitations. . . . . . . . . . . . . . . . . . 8
         B.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
         C.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            1.    The Class Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.    Evidence Outside of the Class Complaint. . . . . . . . . . . . . . . . . 14
            3.    Class Action Tolling Does Not Apply to Contested Claims. . . . . 16

    IV.   DISCUSSION: SUFFICIENCY OF CONSPIRACY EVIDENCE. . . . . . . . . . . 16
         A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
            1.    Explanation of the Matsushita Standard. . . . . . . . . . . . . . . . . 18
            2.    Analyzing Evidence at the Summary Judgment Stage. . . . . . . . . . 21

|  |  | a. | Parallel Behavior. | 21 |
|  |  | b. | Motive and Actions Contrary to Interests. | 22 |
|  |  | c. | Evidence Implying a Traditional Conspiracy.. | 23 |
|  |  | d. | Opportunity to Conspire.. | 23 |
|  |  | e. | Pretextual Explanations. | 24 |
|  | B. | Analysis. | | 24 |
|  |  | 1. | Inland. | 26 |
|  |  |  | a.  Facts. | 26 |
|  |  |  | b.  Analysis. | 33 |
|  |  | 2. | Gaylord. | 35 |
|  |  |  | a.  Facts. | 35 |
|  |  |  | b.  Analysis. | 38 |

V. DISCUSSION: OPPORTUNITY COST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   A. Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   B. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   C. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

VI. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## MEMORANDUM

## I.   INTRODUCTION

In this multidistrict litigation under Section 1 of the Sherman Act, 15 U.S.C. § 1,

plaintiffs allege that several United States linerboard manufacturers conspired to restrict

linerboard output in order to increase the price of corrugated sheets and corrugated boxes.[1]

Currently before the Court are three motions for summary judgment: Defendants' Motion for

---

[1]   Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets, and corrugated boxes.

In re Linerboard Antitrust Litig., 203 F.R.D. 197, 202 (E.D. Pa. 2001).

Summary Judgment With Respect to Statutes of Limitations, Defendant Temple-Inland Inc.'s Motion for Summary Judgment, and Defendant Gaylord Container Corporation's Motion for Summary Judgment.[2]

In the Motion for Summary Judgment With Respect to Statutes of Limitations, defendants argue that the class-action component of MDL No. 1261 did not toll direct-action plaintiffs' state and federal claims based on purchases made between December 1, 1995 and May 1997. The Court agrees with defendants: plaintiffs' claims based on purchases made between December 1, 1995 and May 1997 were not tolled, and are thus time-barred. Accordingly, the Court grants the Motion for Summary Judgment With Respect to Statutes of Limitations.

In Inland's and Gaylord's Motions for Summary Judgment, defendants first argue that, under Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), plaintiffs' conspiracy evidence does not tend to rule out the possibility that defendants acted independently. The Court disagrees with defendants: plaintiffs' conspiracy evidence tends to rule out the possibility of independent action. See id. The facts of this case "strongly suggest-and are 'not merely consistent with'-a price-fixing conspiracy." In re OSB Antitrust Litig., 2007 WL 2253419, *3 (E.D. Pa. Aug. 30, 2007) (citing Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007)). Accordingly, the Court denies defendants' Motions for Summary Judgment with respect to the sufficiency of plaintiffs' evidence of conspiracy.

In Inland's and Gaylord's Motions for Summary Judgment, defendants also challenge plaintiffs' entitlement to "opportunity cost" damages. The Court agrees with defendants:

---

[2] Defense counsel represents both Inland and Gaylord because "Gaylord was acquired by Temple-Inland" after the events at issue in this case transpired. July 5, 2007 Tr. at 65-66. "At the time of the conduct in this case[,] Gaylord was an entirely separate company [that had] nothing to do with Temple-Inland." Id. at 66.

recoupment of opportunity cost damages is equivalent to recovery of prejudgment interest, which is not warranted in this case. Accordingly, the Court grants defendants' Motions for Summary Judgment with respect to plaintiffs' claimed opportunity cost damages.

## II.    BACKGROUND

The factual background of this case is described in detail in this Court's previous opinions. See, e.g., In re Linerboard Antitrust Litig., 2000 WL 1475559, *1 (E.D. Pa. Oct. 4, 2000) (denying motion to dismiss); In re Linerboard Antitrust Litig., 203 F.R.D. 197, 201-04 (E.D. Pa. 2001), aff'd, 305 F.3d 145 (3d Cir. 2002), cert. denied, 538 U.S. 977 (2003) (certifying classes of direct purchasers of corrugated boxes and corrugated sheets); In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568 (E.D. Pa. 2003) (approving final class settlement); In re Linerboard Antitrust Litig., 2004 WL 1221350, *1 (E.D. Pa. Jun. 2, 2004) (awarding class counsel attorney's fees); In re Linerboard Antitrust Litig., 223 F.R.D. 335, 337 (E.D. Pa. 2004) (denying motion to dismiss state claims based on state statutes of limitations); In re Linerboard Antitrust Litig., 223 F.R.D. 357 (E.D. Pa. 2004) (denying motion under Federal Rule of Civil Procedure 60 and motion for expedited discovery); In re Linerboard Antitrust Litig., 2005 WL 1625040, *1 (E.D. Pa. July 11, 2005) (granting motion to remand for lack of subject matter jurisdiction); In re Linerboard Antitrust Litig., 443 F. Supp. 2d 703 (E.D. Pa. 2006) (granting motion for summary judgment against one direct action plaintiff); In re Linerboard Antitrust Litig., 237 F.R.D. 373 (E.D. Pa. 2006) (denying "plaintiffs' motion to compel Inland to provide a Rule 30(b)(6) witness educated with facts recalled by Inland's in-house counsel" under work product doctrine); In re Linerboard Antitrust Litig., __ F. Supp. 2d __, 2007 WL 2172811, *1 (E.D. Pa. July 30, 2007) (denying motion to exclude expert testimony on damages).

4

Plaintiffs in this case purchased corrugated products from defendants.  According to plaintiffs, defendants "conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventories in violation of federal antitrust laws."  In re Linerboard Antitrust Litig, 223 F.R.D. 357, 359 (E.D. Pa. 2004).  Specifically, plaintiffs allege that defendant Stone Container Corporation ("Stone")

> devised a strategy to invite its competitors to increase the price of linerboard.  As part of this strategy, Stone planned to take downtime at its plants to reduce its production and inventory of linerboard substantially, and contemporaneously to purchase substantial amounts of linerboard from competitors--actions which, plaintiffs allege, were extraordinary, and not in the regular course of business.
>
>         \* \* \*
>
> The concerted actions of the defendants in taking downtime at the mills producing linerboard, and then increasing the price of linerboard, resulting in price increases for corrugated sheets and corrugated boxes, forms the basis of the conspiracy at issue in this case.

In re Linerboard Antitrust Litig., 203 F.R.D. 197, 204 (E.D. Pa. 2001).

Plaintiffs' theory of the case is that the alleged conspiracy is tantamount to a price-fixing agreement.  "An agreement on output also equates to a price-fixing agreement.  If firms raise prices, the market's demand for their product will fall, so the amount supplied will fall too--in other words, output will be restricted.  If instead firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply."  Id. at 216 (citing 216 Westinghouse Elec. Corp. v. Gulf Oil Corp., 588 F.2d 221, 226 (7th Cir. 1978)).

## III.    DISCUSSION: STATUTES OF LIMITATIONS

Direct-action plaintiffs assert claims pertaining to: (1) purchases made between October 1, 1993 through November 30, 1995, based on allegedly anticompetitive behavior occurring in 1993; and (2) purchases made between December 1, 1995 and May 1997, based on allegedly

anticompetitive behavior beginning in 1995 and continuing into 1996.   See Opp. to SOL Mot. at 2.  The parties agree that plaintiffs' claims based on purchases made between October 1, 1993 through November 30, 1995 were tolled by the class action; defendants argue only that plaintiffs' state and federal claims based on purchases made between December 1, 1995 and May 1997 were not tolled.  SOL Mot. at 19, 30-31.  The Court concludes that plaintiffs' state and federal claims based on purchases made between December 1, 1995 and May 1997 were not tolled by the class action, and are thus barred by the applicable statutes of limitations.

### A.     Facts

On February 12, 1999, the Judicial Panel on Multidistrict Litigation transferred seven lawsuits to this Court for pretrial proceedings.  These lawsuits were instituted after the Federal Trade Commission ("FTC") filed an administrative complaint against Stone Container Corporation which was resolved by a consent decree.  In re Linerboard Antitrust Litig., 2000 WL 1475559, *1 (E.D. Pa. Oct. 4, 2000) (setting forth allegations in FTC complaint and details of consent decree).

### 1.     The Class Case

By Memorandum and Order dated September 4, 2001, this Court certified the following two plaintiff classes:

**Class 1-Sheet Class**
All individuals and entities which purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated sheets pursuant to contracts in which the purchase price was not tied to the price of linerboard.

**Class 2-Box Class**

> All individuals and entities which purchased corrugated containers in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated containers pursuant to contracts in which the purchase price was not tied to the price of linerboard or containerboard.

In re Linerboard Antitrust Litig., 203 F.R.D. 197, 201-04 (E.D. Pa. 2001), aff'd, 305 F.3d 145 (3d Cir. 2002), cert. denied, 538 U.S. 977 (2003).

Additionally, the Amended Sheets Complaint states, "beginning at least as early as June of 1993, the exact date being unknown to plaintiffs, and continuing thereafter *at least* through November of 1995, the defendants and their co-conspirators engaged in a continuing combination and conspiracy . . . ." Am. Sheets Compl. ¶ 36 (emphasis added). The Amended Box Complaint does not include the "at least" language, but states, "In August 1993, Stone implemented the first of a series of price increases that took place during the Class Period. . . . Subsequently, . . . the major manufacturers . . . . continued their pattern of taking substantial downtime and implementing price increases." Am. Box Compl. ¶¶ 47-48.

"All claims in the class case were [settled] for a total of $202,572,489." In re Linerboard Antitrust Litig. 443 F. Supp. 2d 703, 706-07 (E.D. Pa. 2006).

### 2.     The Direct Actions

On or before June 9, 2003, 140 entities opted out of the classes certified by the Court by filing Requests for Exclusion. "These 140 entities opted-out themselves and approximately 3400 subsidiary and affiliate companies. Of the 140 Requests for Exclusion, thirteen groups of opt-outs subsequently filed direct actions against defendants alleging both federal and state claims." Id. Direct-action plaintiffs' "claims against all other defendants [excluding Inland and Gaylord]

7

have either been settled or withdrawn." Id.

Direct-action plaintiffs allege in their complaints that defendants' unlawful coordination of downtime caused "Plaintiffs to pay artificially inflated prices for corrugated material that they purchased from Defendants from at least October 1993 *until at least February 1997*." Proctor & Gamble Compl. ¶ 3 (emphasis added). The 1995-1997 claims "add more than $600 million of purchases . . . to the case." SOL Mot. at 1. These claims "more than double the size of the underlying class case . . . ." SOL Rep. at 1.

### 3.     Tolling of the State Statutes of Limitations

In In re Linerboard Antitrust Litig., 223 F.R.D. 335 (E.D. Pa. 2004), the Court concluded that the statutes of limitations relevant to the state law claims in this case were tolled "during the pendency of the class action" until direct-action "plaintiffs filed Requests for Exclusion from the classes . . . ." Id. at 344. In contrast, the Court did not address whether plaintiffs' federal and state claims based on purchases between December 1, 1995 and May 1997 were tolled, as plaintiffs suggest in their opposition. Compare id. with SOL Opp. at 12-13.

### B.     Standard of Review

The well-known summary judgment standard applies where, as in this case, a defendant files "a motion for summary judgment against plaintiffs arguing that plaintiffs' claims were barred by [the applicable] statute of limitations" and "[p]laintiffs dispute that the statute of limitations ran on their claims and assert that the statute of limitations was tolled." Smith v. Burrows Corp., 2005 WL 2106594, *2 (W.D. Pa. Aug. 31, 2005).

 A court should grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248  (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law."  Id. In considering a motion for summary judgment, the "facts must be viewed in the light most favorable to the party opposing summary judgment."  Internat'l Raw Mats, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

The Clayton Act " mandates a four-year statute of limitations for civil antitrust actions . . . ." In re Linerboard Antitrust Litig., 305 F.3d 145, 160 (3d Cir. 2002) (citing 15 U.S.C. §  15(b)).  That is the statute of limitations applicable to plaintiffs' federal claims in this case.  None of the applicable state statutes of limitations are greater in length than the Clayton Act's four-year limitations period.  In re Linerboard Antitrust Litig., 223 F.R.D. 335, 337 (E.D. Pa. 2004) (stating the applicable statutes of limitations for Colorado (four years), Indiana (two years), Kansas (three years), South Carolina (three years), and Tennessee (three years)).

Filing a federal class action tolls the statute of limitations on individual claims pending a decision on class certification in the same federal court based on the facts alleged in the class case. Crown Cork & Seal Inc. v. Parker, 462 U.S. 345 (1983); Am. Pipe & Const. Co. v. Utah, 414 U.S. 538 (1974).  In American Pipe, the Supreme Court reasoned that the purpose of Federal Rule of Civil Procedure 23 would not be served by precluding putative class members from

9

intervening in a class case if they failed to do so within the applicable statute of limitations.  414

U.S. at 550-52.  As the Supreme Court further explained,

> Not until the existence and limits of the class have been established and notice of
> membership has been sent does a class member have any duty to take note of the suit or
> to exercise any responsibility with respect to it in order to profit from the eventual
> outcome of the case.  It follows that even as to asserted class members who were unaware
> of the proceedings brought in their interest or who demonstrably did not rely on the
> institution of those proceedings, the later running of the applicable statute of limitations
> does not bar participation in the class action and in its ultimate judgment.

Id.  The Supreme Court reasoned that refusing to extend the tolling rule to class members would

"deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal

purpose of the procedure," leading to the filing of numerous protective, duplicative and in many

cases, unnecessary, suits by individual class members.  Id. at 553-54.  Moreover, the Supreme

Court concluded that the tolling rule is not inconsistent with the purposes behind statutes of

limitations, namely, preventing plaintiffs from bringing "stale claims" with no prior notice to

defendants.  Id.

   Crown Cork & Seal extended the ruling in American Pipe to cases in which class

members filed individual suits instead of intervening in the class action after the denial of class

certification.  462 U.S. at 354.  In so ruling, the Supreme Court reasoned that, because defendants

were put on notice of the factual predicates for all of the potential antitrust claims of class

members, no "potential for unfair surprise" would be created by tolling the statutes of limitations

for plaintiffs' claims during the pendency of class certification.  Id. at 353 (noting that once a

class action is filed, "[t]he defendant will be aware of the need to preserve evidence and

witnesses respecting the claims of all the members of the class").

   American Pipe's holding has been extended to situations, such as the one presented in

this case, in which a class is certified and putative class members choose to opt out of the litigation and file individual suits against the defendants.  See, e.g., Realmonte v. Reeves, 169 F.3d 1280, 1284 (10th Cir.1999) (collecting cases).  In applying the American Pipe rule to class members who opted out of a class after class certification, the Realmonte court stated:

> Considering the Supreme Court's rationale that tolling the applicable statute of limitations during the course of a class member' participation would serve to prevent the "needless duplication of motions" and protective filings by parties seeking to preserve their rights, we believe that, in this case, the tolling rule would even be more applicable.

Id.  Continuing, the Supreme Court stated that the Rule 23(c)(2) requirement of notice to all class members that can upon request be excluded from the class would be meaningless if the statute of limitations for such members' subsequent individual claims were not tolled.  Id. (citing Crown Cork, 462 U.S. at 351-52).

For tolling to apply, claims do not have to be identical but only substantially similar to those brought in the original class action.  In re Linerboard Antitrust Litig., 223 F.R.D. 335, 351 (E.D. Pa. 2004) (citing Crown Cork, 462 U.S. at 355).  "[W]hen a plaintiff invokes American Pipe in support of a separate lawsuit, the district court should take care to ensure that the suit raises claims that 'concern the same evidence, memories, and witnesses as the subject matter of the original class suit.'"  Crown Cork, 462 U.S. at 355 (citing Am. Pipe, 414 U.S. 538, 562) (Powell, concurring).

### C.    Analysis

#### 1.    The Class Complaints and Class Definitions

To determine the scope of the class for tolling purposes, the Court looks first to the class complaints and class definitions.

11

In <u>Smith v. Pennington</u>, 352 F.3d 884, 893 (4th Cir. 2003), the Fourth Circuit noted that courts "usually look to the complaint to determine the scope of a plaintiff's asserted class for tolling purposes. The <u>Pennington</u> court further noted that, when "an unambiguous definition" of the class "is more narrow than is arguably dictated by [the class] complaint, [the] asserted class for tolling purposes may be limited to that more narrow definition." <u>Pennington</u>, 352 F.3d at 894.

Both the Sheet and the Box Classes were limited to "individuals and entities which purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 *through November 30, 1995* . . . ." <u>In re Linerboard Antitrust Litig.</u>, 203 F.R.D. 197, 201-04 (E.D. Pa. 2001), <u>aff'd</u>, 305 F.3d 145 (3d Cir. 2002), <u>cert. denied</u>, 538 U.S. 977 (2003) (emphasis added). These class definitions unambiguously restrict the scope of the class action to purchases made no later than November 30, 1995. Similarly, in <u>In re Syntex Corp. Securities Litig.</u>, 95 F.3d 922, 935 (9th Cir. 1996), "[p]laintiffs defined the Class as purchasers of Syntex's stock between November 25, 1991 and May 26, 1992." Concluding that "the proposed plaintiffs wanted to expand the class in order to become class members," the Ninth Circuit held "that Plaintiffs' claims extending the class period beyond May 26, 1992 . . . were barred by the statute of limitations." <u>Id.</u> at 936. The fact that the Sheets plaintiffs stated in their class complaint that "beginning at least as early as June of 1993 . . . and continuing thereafter *at least* through November of 1995, the defendants and their co-conspirators engaged in a continuing combination and conspiracy" is unavailing because the class definition is unambiguous on this point.

Plaintiffs argue that <u>In re Syntex</u>, 95 F.3d at 936 is inapposite because the Ninth Circuit

denied tolling to plaintiffs who were not "asserted class" members" but instead "wanted to

expand the class in order to become class members."  The Court recognizes this distinction but

finds it unpersuasive in this case.  The class definition in this case defined both the "class" and

the "class period."  As explained in In re Cigna Corp. Securities Litigation, 459 F. Supp. 2d 338,

339 n.1 (E.D. Pa. 2006), "the 'damage period' or 'class period' in a securities fraud case is

generally the period of time during which plaintiffs allege that the stock price of the defendant

corporation was inflated due to fraudulent statements made by company management . . . ."

Similarly, the class period in an antitrust case is the period of time during which plaintiffs allege

that the prices of the purchases in question were inflated due to anticompetitive behavior.[3]  See

In re Linerboard Antitrust Litig. 321 F. Supp. 2d 619, 632 (E.D. Pa. 2004).  It is clear that the

November 30, 1995 date defined not only the participating class members, but also the relevant

purchases of these class members.  See In re Linerboard Antitrust Litig., 203 F.R.D. 197, 221

(E.D. Pa. 2001), aff'd, 305 F.3d 145 (3d Cir. 2002), cert. denied, 538 U.S. 977 (2003) ("Plaintiffs

ask the Court to certify both classes starting October 1, 1993 and continuing through November

30, 1995.  They argue that this period represented the time in which the price of corrugated boxes

and containers was affected by the price-fixing conspiracy.").  As set forth in the Sheet and Box

class definitions, the class period--the period of time during which linerboard prices were

allegedly inflated--ended on November 30, 1995.

   Importantly, direct-action plaintiffs are not merely seeking a different type of relief based

---

   [3] In In re Linerboard Antitrust Litig. 321 F. Supp. 2d 619 (E.D. Pa. 2004), the Court noted
that "Plaintiff Classes' expert constructed an econometric model and determined that over the
class period, prices for boxes and sheets were 2.7 percent higher than they would have been
absent the alleged conspiracy. . . . [T]he result was total damages in the amount of $478 million
over the class period."  Id. at 632.

on purchases within the class period.  In <u>In re Ind. Serv. Orgs. Antitrust Litig.</u>, 1997 WL

161940, *3 (D. Kan. March 12, 1997), a case upon which plaintiffs rely, the defendant argued

that the direct-action plaintiff's claims differed from the class's claims because the "class

asserted claims only for damages resulting from overcharges for parts, whereas [direct-action

plaintiff] asserts damages in this action for lost profits."  The court in that case ruled that the

direct-action claim was tolled because the class action suit was "identical to [the] individual's

subsequent suit except for the relief requested."  <u>Id.</u>  This Court came to substantially the same

conclusion in <u>Swierkowski v. Consolidated Rail Corp.</u>, 168 F. Supp. 2d 389, 394 (E.D. Pa.

2001), a discrimination case.  However, both cases are inapposite because direct-action plaintiffs

in this case seek damages on new purchases outside of the class period; in contrast, direct-action

plaintiffs do not merely seek a different type of relief based on the same purchases within the

class period.

      In sum, given the unambiguous language of the class definitions in this case, defendants

could not have had fair notice from those definitions that direct-action plaintiffs would add $600

million of claims based on purchases occurring after the conclusion of the class period on

November 30, 1995.

**2.      Evidence Outside of the Class Complaint**s

      The Court is not "confined to examine only the complaint in determining the scope of . . .

a plaintiff's asserted class for tolling purposes . . . ."  <u>Pennington</u>, 352 F.3d 884, 893 (4th Cir.

2003).  To determine whether defendants had  "fair notice" of plaintiffs' claims based on

purchases after November 30, 1995, the Court may also "consider evidence outside of the

complaint that demonstrates the extent of the class the plaintiff represented to the district court

14

that he desired to have certified--especially when the complaint itself is unclear." Id. The Court examined "outside evidence" in this case and concludes that the "outside evidence" confirms that defendants were not given notice of plaintiffs' claims based on purchases made after November 30, 1995.

From its inception until settlement, the class case was based on downtime taken in 1993 that allegedly affected prices through November 30, 1995. In contrast, the class case never included downtime beginning in 1995 and continuing into 1996 that allegedly affected prices from December 1, 1995 until May 1997. For example, in analyzing the class settlements, the Court noted that the class case pertained to "substantial downtime taken in 1993" that "produced a decease in production of 385,000 to 435,000 tons, or approximately 1 percent of production."[4] In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 579 (E.D. Pa. 2003).

The facts underlying direct-action plaintiffs' claims based on purchases from December 1, 1995 until May 1997 are entirely different from the facts underlying plaintiffs' claims based on purchases during the class period. As one of plaintiffs' liability expert stated, "there weren't the same kind of communications in 1995 as there were in 1993." Rubinfeld Dep. at 317.

Additionally, for the purposes of class certification, class plaintiffs' damages expert, John Beyer, examined the price effects of the 1993 downtime through 1995. See In re Linerboard Antitrust Litig., 203 F.R.D. 197, 219 (E.D. Pa. 2001), aff'd, 305 F.3d 145 (3d Cir. 2002), cert.

_____

[4] The Court also noted that

Defendants would have been able to argue that these two economic forces-sharply rising costs and increased demand-contributed to the steep price increases more than the allegedly collusive downtime in 1993. This counter-theory combined with the other weaknesses in Plaintiff Classes' evidence raises not insignificant risks to establishing liability and damages.

In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 579 (E.D. Pa. 2003).

denied, 538 U.S. 977 (2003).  Indeed, Dr. Beyer used December 1, 1995 through December 1998 as his untainted "benchmark period" in order to estimate the alleged overcharge during the class period.

Finally, as defendants point out, "the Court-approved settlement was predicated on the understanding – and the position advocated by class plaintiffs' own expert – that the December 1995 through December 1998 period was free of any collusion."  SOL Rep. at 17.

### 3.    Class Action Tolling Does Not Apply to Contested Claims

Based on the class complaints, the class definitions, and evidence outside of the complaints, the Court concludes that defendants had no notice of direct-action plaintiffs' claims based on purchases after November 30, 1995.  The contested claims do not "concern the same evidence, memories, and witnesses as the subject matter of the original class suit" pertaining to 1993 downtime.  Crown Cork, 462 U.S. at 355 (citing Am. Pipe, 414 U.S. 538, 562) (Powell, concurring).  Accordingly, these claims were not tolled and are barred by the applicable statutes of limitations.

## IV.    DISCUSSION: SUFFICIENCY OF CONSPIRACY EVIDENCE

Defendants argue that plaintiffs do not offer evidence tending to exclude the possibility that Gaylord and Inland each acted independently, in response to their internal inventory situations, in taking 1993 downtime.  The Court disagrees.  Plaintiffs offer extensive and interconnected evidence–parallel conduct, pretextual explanations, opportunities to conspire, and abnormal contacts between competitors–which tends to exclude the possibility of independent action.  The Court notes that it addresses only the sufficiency of plaintiffs' evidence related to 1993 market downtime (which allegedly had price effects that lingered until the conclusion of the

16

class period on November 31, 1995); the Court does not address plaintiffs' evidence related to 1995 and 1996 market downtime (which allegedly had price effects from December 1996 until May 1997) because these claims are time-barred.

### A.     Standard of Review

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1.  This provision "was intended to prohibit only unreasonable restraints of trade." Bus. Elec. Corp. v. Sharp Elec. Corp., 485 U.S. 717, 723 (1984).  "Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation." Id.  "Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices . . . ."[5]  Leegin Creative Leather Products, Inc. v. PSKS, Inc., 127 S.Ct. 2705, 2713 (2007) (citing Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)).  The *per se* standard applies in this case because plaintiffs allege a horizontal conspiracy to restrict output, which is tantamount to a horizontal price-fixing agreement.[6]  In re Linerboard Antitrust Litig., 203 F.R.D.

---

[5]  "Resort to per se rules is confined to restraints . . . that would always or almost always tend to restrict competition and decrease output." Leegin, 127 S.Ct. at 2713 (quotation omitted) (holding that, in contrast to horizontal price-fixing agreements, vertical minimum-resale-price agreements do not justify application of the *per se* rule).

[6]     An agreement on output also equates to a price-fixing agreement.  If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too-in other words, output will be restricted.  If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply.  Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects.

In re Linerboard Antitrust Litig., 203 F.R.D. 197, 215-16 (E.D. Pa. 2001) (citing Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588 (7th Cir. 1984) (Posner, J.)).

197,  216 (E.D. Pa. 2001) (citing United States v. Andreas, 216 F.3d 645, 667 (7th Cir. 2000)).

"Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express . . . ." Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964 (2007). Evidence of parallel behavior or even conscious parallelism,[7] alone, is insufficient to establish a violation of Section 1.  Id. at 1964.  "The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  Id.

Accordingly, the Supreme Court has "hedged against false inferences from identical behavior at a number of points in the trial sequence."  Id.  "[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently . . . ."  Id. (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)); see also Cosmetic Gallery, Inc. v. Schoeneman Corp., __ F.3d __, 2007 WL 2051099, *4 (3d Cir. July 19, 2007) ("Twombly . . . signaled the vitality of Matsushita and Monsanto.").

The Court first explains the Matsushita summary judgment standard, and then explicates

_____

[7]        Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993).

the categories of circumstantial evidence that a plaintiff may offer to meet this standard.

### 1.    Explanation of the <u>Matsushita</u> Standard

"Generally, the movant's burden on a summary judgment motion in an antitrust case 'is no different than in any other case.'"  <u>InterVest, Inc. v. Bloomberg, L.P.</u>, 340 F.3d 144, 159-60 (3d Cir. 2003) (quoting <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992)).  Thus, summary judgment is appropriate when the evidence shows "that there is no genuine issue as to any material fact . . . ."  Fed. R. Civ. P. 56(c).  "When analyzing the sufficiency of the evidence, the court must view the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment."  <u>Eastman Kodak Co. v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 456 (1992).

As the Supreme Court explained in <u>Matsushita</u>, however, "the antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case."  475 U.S. at 588 (citing <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752, 764 (1984) (holding "that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy")).  "To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently."[8]  <u>Id.</u>

---

[8] The Third Circuit has held that "the <u>Matsushita</u> standard applies only when the plaintiff has failed to put forth direct evidence of conspiracy."  <u>Intervest</u>, 340 F.3d at 160 (citations omitted). "This is because direct evidence obviates the fact finder's need to make inferences of a conspiracy, and therefore the Supreme Court's concerns over the reasonableness of inferences in antitrust cases evaporate." <u>Id.</u> (citations omitted).  Whether or not <u>Twombly</u> affects this holding in any way, this Court has recognized that "[t]here is no direct evidence of any meeting at which defendants agreed to take downtime or to raise prices and there was no direct evidence of conversations in which one conspirator agreed with another to take reciprocal downtime."  <u>In re Linerboard Antitrust Litig.</u>, 2004 WL 1221350, *12 (E.D. Pa. 2004).  Thus, <u>Matsushita</u> applies.

(quoting <u>Monstanto</u>, 465 U.S. at 764).  "[I]n other words, [plaintiff] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents."  <u>Id.</u> (citing <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 280 (1968)).  "More evidence is required the less plausible the charge of collusive conduct."  <u>In re High Fructose Corn Syrup Antitrust Litig.</u>, 295 F.3d 651, 661 (7th Cir. 2002) (Posner, J.).

In <u>Eastman Kodak Co. v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 468-69 (1992), the Supreme Court clarified that <u>Matsushita</u> "did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases."  "<u>Matsushita</u> demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision."  <u>Id.</u>; <u>see also</u> <u>Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.</u>, 998 F.2d 1224, 1231 -32 (3d Cir. 1993) (noting that "<u>Matsushita</u> did not invent a new requirement for an antitrust plaintiff to meet, but merely articulated an established one, i.e., the inferences drawn from the proffered evidence must be reasonable").  "The [Supreme] Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment."  <u>Eastman Kodak</u>, 504 U.S. at 468.  That is, "<u>Monsanto</u> and <u>Matsushita</u> do not mean that antitrust defendants are entitled to summary judgment merely by showing that there is a plausible explanation for their conduct; rather, the focus must remain on the evidence proffered by the plaintiff and whether that evidence tends to exclude the possibility that [the defendants] were acting independently."  <u>InterVest,</u> 340 F.3d at 160 (citation omitted).

"In sum, a court 'must ascertain whether the plaintiffs have presented evidence that is

sufficiently unambiguous showing that the defendants conspired.'" <u>Id.</u>  (quoting <u>In re Baby Food</u> <u>Antitrust Litig.</u>, 166 F.3d 112, 118 (3d Cir. 1999) (quoting <u>Matsushita</u>, 475 U.S. at 597)).   At the summary judgment stage, "'a court is not to weigh the evidence or make credibility determinations'; these are tasks left for the fact-finder."  <u>Id.</u> (quoting <u>Petruzzi's</u>, 998 F.2d at 1230).

### 2.      Analyzing Evidence at the Summary Judgment Stage

"There is often a fine line between legitimate business practices and unlawful concerted action, and direct evidence--the smoking gun-of illegal conspiracy may not be available.  Thus it is essential to consider all of the evidence proffered to determine whether it is sufficient to withstand a motion for summary judgment."  <u>Cosmetic Gallery</u>, __ F.3d __, 2007 WL 2051099, at *4.  Importantly, "a court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead analyze it as a whole to see if together it supports an inference of concerted action."  <u>InterVest,</u> 340 F.3d at 160 (citing <u>Petruzzi's IGA</u>, 998 F.2d at 1230).  As Judge Posner pointed out in <u>In re High Fructose Corn Syrup Antitrust Litig.</u>, one

> trap to be avoided in evaluating evidence of an antitrust conspiracy for purposes of ruling on the defendants' motion for summary judgment is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment. It is true that zero plus zero equals zero. But evidence can be susceptible of different interpretations, only one of which supports the party sponsoring it, without being wholly devoid of probative value for that party. Otherwise what need would there ever be for a trial?

295 F.3d 651, 655-56 (7th Cir. 2002) (Posner, J).

The Court next discusses the various types of conspiracy evidence presented in this case.

### a.      Parallel Behavior

"[A]lthough it falls short of conclusively establishing agreement or itself constituting a

Sherman Act offense, a showing of consciously parallel behavior may be admissible as circumstantial evidence."  Cosmetic Gallery, ___ F.3d ___, 2007 WL 2051099, at *4 (citing Twombly, 127 S.Ct. at 1965) (quotations, brackets, and ellipses omitted).  "To establish illegal concerted action based on consciously parallel behavior, a plaintiff must show (1) that the defendants' behavior was parallel; (2) that the defendants were conscious of each other's conduct and that this awareness was an element in their decision-making process; and (3) certain plus' factors."  In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 n.11 (3d. Cir. 2004) (quotations omitted).  "Existence of . . . plus factors tends to ensure that courts punish 'concerted action'-an actual agreement-instead of the 'unilateral, independent conduct of competitors.'"  Id. (quoting In re Baby Food, 166 F.3d 112, 122 (3d. Cir. 1999)).   Although "no exhaustive list exists[,]" the Third Circuit has identified "at least three such plus factors: (1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'"  Id. (quoting Petruzzi's, 998 F.2d at 1244).

### b.    Motive and Actions Contrary to Interests

"Evidence that the defendant had a motive to enter into a price fixing conspiracy means evidence that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion."  In re Flat Glass Antitrust Litig., 385 F.3d at 360 (citing In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d at 65).  "Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market.  In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors

22

were setting prices above marginal costs."  Id. at 360-61.

"In the context of parallel pricing, [motive and actions contrary to interests] largely

restate the phenomenon of interdependence."  Id. (citing In re Baby Food, 166 F.3d at 122).

Accordingly, these factors "may not suffice-by themselves-to defeat summary judgment on a

claim of horizontal price-fixing among oligopolists."  Id. at 361.  Nevertheless, they "are

important to a court's analysis, because their existence tends to eliminate the possibility of

mistaking the workings of a competitive market-where firms might increase price when, for

example, demand increases-with interdependent, supracompetitive pricing."  Id.

### c.     Evidence Implying a Traditional Conspiracy

The Third Circuit has stated that "[t]he most important evidence will generally be

non-economic evidence that there was an actual, manifest agreement not to compete."  Id. at 361

(quotations omitted).  "That evidence may involve customary indications of traditional

conspiracy, or proof that the defendants got together and exchanged assurances of common

action or otherwise adopted a common plan even though no meetings, conversations, or

exchanged documents are shown."  Id.  (quotations omitted).

### d.     Opportunity to Conspire

Proof of opportunity to conspire is relevant, but "is not enough to sustain an antitrust

plaintiff's burden, and, without more, does not create a jury question on the issue of concerted

action."  Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 473 (3d Cir. 1985); see also

Petruzzi's, 998 F.2d at 1235 ("Proof of opportunity to conspire, without more, will not sustain an

inference that a conspiracy has taken place.").  The Third Circuit stressed in In re Baby Food

Antitrust Litig. that "[c]ompany personnel do not often operate in a vacuum or 'plastic bubble';

they sometimes engage in the longstanding tradition of social discourse." 166 F.3d at 133

("[E]vidence of social contacts and telephone calls among representatives of the defendants was

insufficient to exclude the possibility that the defendants acted independently.").

### e.     Pretextual Explanations

The Third Circuit has long recognized that evidence of pretextual explanations for price

increases or output restrictions, "if believed by a jury, would disprove the likelihood of

independent action" by an alleged conspirator.  Fragale, 760 F.2d at 474; see also Rossi v.

Standard Roofing, Inc., 156 F.3d 452, 478 (3d Cir. 1998).  However, without more, evidence of

pretext is insufficient.  DeLong Equip. Co. v. Washington Mills Abrasive Co., 887 F.2d 1499,

1514 (11th Cir. 1989).  "For evidence of pretext to support an inference of conspiracy, . . . it must

be supported by additional evidence of opportunity to conspire, direct evidence of an agreement,

or other circumstantial evidence of restraint of trade."  City of Moundridge v. Exxon Mobil

Corp., 429 F. Supp. 2d 117, 134 (D.D.C. 2006) (citing Fragale, 760 F.2d at 474).

### B.     Analysis

This case centers upon the taking of "market downtime" at linerboard mills by Inland and

Gaylord.  In contrast to maintenance downtime, market downtime is the idling of machines that

are capable of full production.  Gaylord Dep. 35-37; Zimbelman Dep. II 328; Sobieralski Dep.

94-95.  Market downtime is incredibly expensive; it entails shutdown costs, startup costs, and

opportunity costs of forgone sales.  Glick Dep. 66.  Additionally, in a competitive market, a

producer who takes market downtime risks losing business to a competitor if that producer is

unable to supply a customer.  Pomerantz Dep. I 120; Nolden Dep. 217-18.  James Dougan, an

executive at Stone, testified in deposition as follows with respect to the taking of market

downtime:

> You don't shut a mill down.  I mean it's just against the world, against the law. . . . It's
> against the rules because you're losing production shutting it down.  You're giving up
> that production forever and you have to have one hell of a strong reason to do that.  And
> the only reason I know of to do that is to effect an improvement in pricing or to prevent a
> downplay of pricing.

Doughan Ark. Dep. 71-72.

Prior to the market downtime at issue in this case, Inland had never taken market

downtime in its forty-plus year history of operating linerboard mills.[9]  Gaylord took only one

brief episode of market downtime in the 10 years before the market downtime at issue in this

case.  Marshall Rpt. ¶ 314.

Given this backdrop, the Court examines whether plaintiffs' evidence of the events

surrounding Gaylord's and Inland's 1993 market downtime "tends to exclude the possibility' that

the alleged conspirators acted independently."  Matsushita, 475 U.S. at 588.

Plaintiffs offer extensive evidence that defendants: (1) "had a motive to enter into a price

fixing conspiracy" because the market conditions of the linerboard industry were conducive to

collusion; and (2) "acted contrary to its interests."  In re Flat Glass Antitrust Litig., 385 F.3d at

360 (citing Petruzzi's, 998 F.2d at 1244).   Because of the extraordinary amount of evidence in

this case, the Court does not discuss these factors–motive, industry susceptibility to collusion,

and actions contrary to interest–in detail.  Suffice it to say, the Court agrees with plaintiff that:

> (1)   The industry[] [was] susceptib[le] to collusion. Containerboard was a
> homogeneous commodity sold in a concentrated market with high barriers to entry
> and "huge" fixed costs of production. These were textbook conditions for illegal
> collusion.

---

[9] Defendants do not dispute this point.  Brown, July 5, 2007 Tr. at 99 (stating that
"plaintiffs' theory in the case is that Inland had never taken down time before, which is correct").

> (2)     There is ample evidence that Defendants' decisions to take market downtime were contrary to their independent self-interest–for example because, according to Defendants' own estimates, the cost of market downtime far exceeded the cost of selling off inventory at lower prices–and that taking market downtime became profitable only because other [alleged] conspirators . . . reduce[d] inventories and increase prices.

Opp. at 4.

This evidence is important, but because these factors do not alone tend to exclude the possibility of independent action, the Court's analysis focuses primarily on "customary indications of traditional conspiracy . . . that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan . . . ." Id. at 361.  The Court does "not tightly compartmentalize the evidence put forward by [plaintiffs], but instead analyze[s] it as a whole to see if together it supports an inference of concerted action." InterVest, 340 F.3d at 160.

Plaintiffs' evidence of a traditional conspiracy, in conjunction with plaintiffs' ample evidence of motive and actions against interest, easily meets the Matsushita standard.  The Court emphasizes that the amount of evidenced offered by plaintiffs is immense.  A comprehensive review of plaintiffs' evidence is unnecessary because that part of the evidence discussed in this Memorandum is sufficient to meet the Matsushita standard.  For example, the Court recognizes the importance of plaintiffs' evidence of Stone's interactions with alleged conspirators other than Inland and Gaylord, but does not address this evidence in detail.  Nor does the Court discuss in detail the successful price increases that ensued after the taking of market downtime in this case. See In re Linerboard Antitrust Litig., __ F. Supp. 2d __, 2007 WL 2172811, *1 (E.D. Pa. July 30, 2007) (denying motion to exclude expert testimony on damages resulting from the price increases).

26

1.      Inland

a.      Facts

According to plaintiffs, Stone first attempted to initiate a price increase in January 1992.

Counterstatement ¶ 66.  In a letter dated January 29, 1992 from Gordon Jones, an executive at

Stone, to Ron Zimbelman, an executive at Inland, Jones stated that Stone planned to increase

linerboard prices "to return to a list price of $410 per ton in the Eastern United States."   Letter

from Gordon L. Jones to Ron Zimbelman (Jan. 29, 1992), Inland 112036.   He further wrote, "As

a committed member of this industry, we continue to believe that corrugated products and their

raw materials are . . . worthy of adequate return on our investment.  We trust you agree and

continue to appreciate your support."  Id.

Plaintiffs assert that Stone again attempted to initiate a price increase in June 1992.  In a

memo dated July of 1992, Inland noted that "[m]ost containerboard producers, including Inland

Container, have announced a $40 per ton price increase for linerboard and medium."  Memo

from S.E. MacNulty to B. J. Haasch et al. (July 15, 1992), Inland 110520.  According to Inland,

"this announcement appears to have an excellent chance of success" because, among other

reasons, "containerboard inventories are currently at 5.8 weeks of supply and appear to be under

control."  Id.

Both alleged attempts to increase prices failed.   As stated in Inland's 1993 Budget

Presentation, the "two failed attempts to raise prices by the industry has led to further price

deterioration which started towards the end of 1992."  Inland Container Corp., 1993 Budget

Presentation, Inland 021160.

On March 26, 1993, Roger Stone drafted an internal memorandum pertaining to the failed

27

price increase attempts.  In that memorandum, he stated, "I do blame Weyerhauser and Inland for failure of this price increase. . . ."  Memo from Roger Stone to Bill Laimbeer (March, 26, 1993), SCC 032471.  Roger Stone referred to leadership at Inland as "a group of assholes who do not care about their shareholders."  Id.  This memorandum makes clear that, at this point, Inland was not part of the alleged conspiracy to implement market downtime.

On May 26, 1993, Roger Stone drafted a second internal memorandum in which he stated as follows:

> I don't understand.  Why shouldn't the low-cost producer take downtime to adjust inventory?  Where did I say we were the lowest cost producer?  Can you give me back the 50,000-70,000 tons of downtime we've already taken? . . . *I obviously prefer industry players taking downtime to reduce inventory overhang. . . . If you have a strategy to help this highly rational behavior become contagious in this industry, I would dearly like to hear it.*

Memo from Roger Stone to Bill Laimbeer (May 26, 1993), SCC 032468 (emphasis added).

Between May and June 1993, Richard Beile, an executive of Stone,[10] negotiated a "setoff agreement" with Ron Zimbelman and Bart Doney of Inland.  Letter from Ronald R. Zimbelman to Richard Beile (June 28, 1993), Inland 065583.  The agreement was signed by the parties on June 28, 1993.  Id.  Negotiation of setoff agreements, where producers swap containerboard on a ton-for-ton basis, is routine in the linerboard industry.  Pl.'s Counterstatement ¶ 15.  In-and-of themselves, setoff agreements are not anticompetitive, and in fact offer procompetitive advantages such as reduction of transportation cost.  See Brown, July 5, 2007 Tr. at 108, 122; July 6, 2007 Tr. at 107.  According to plaintiffs, "the agreement itself, it's not really important.  It's the fact that while it is going on, there are a number of meetings between Mr. Beal [sic] and

---

[10]According to plaintiffs, "the record shows . . . Beal [sic] was one of Roger Stone's right hand men."  July 6, 2007 Tr. at 5.

executives of Inland at the very time."  July 6, 2007 Tr. at 4.

On June 2, 1993, Inland conducted its first formally-recorded analysis of market downtime.  Proposed Mill Downtime (June 2, 1993), Inland 030125-26.  The only prior "analysis" of market downtime that defendants point to is a short handwritten note authored by Ted Owens, Vice President of Inland's Containerboard Division, dated November 25, 1992. Inland Mot. at 10 (citing Inland 030154).

On June 28, 1993, Ben Lancashire, CEO of Inland Paperboard and Packaging Co., an Inland subsidiary, sent a letter to Clifford Grum, CEO of Temple-Inland, requesting permission to implement market downtime.  Letter from Lancashire to Grum (June 28, 1993), Inland 025450-52.  That letter states that

> inventory levels at year end will be . . . considerably higher than we have storage capacity for and at a level which is unacceptable for carry over into 1994. . . . Unless some unexpected event should occur, such as serious mill mechanical downtime or a dramatic increase in demand, we have only two alternatives in solving this serious inventory problem:
>
> 1)    Attempt to sell additional containerboard into the export markets at significantly reduced prices from today's below full cost levels.  It is unlikely that this is a viable option and would certainly destroy an already troubled market.
>
> 2)    Implement unscheduled mill downtime over the next several months.

Id.  Significantly, the Lancashire letter does not discuss selling additional containerboard domestically or warehousing containerboard for sale when prices increase.[11]  See id.  The

---

[11]  According to James Doughan, executive vice president of Stone, storage costs were minute.  Specifically, Doughan testified as follows:

Q.    Yes, but the cost of holding the inventory –
A.    Peanuts.
Q.    –would accumulate.  But it would accumulate it, would it not?
A.    It's peanuts.
Q.    Would it accumulate?

estimated total cost for the downtime was $3,480, 391, and the estimated net cost of the
downtime was $2,434,966.  Id.  The letter proposed seven and one half days of downtime
commencing July 28, 1993, seven and one half days of downtime commencing in early
September 1993, seven and one half days of downtime commencing in early mid-October 1993,
and "a contingency plan for further downtime in December [1993] . . . if that should become
necessary."  Id.

Consistent with this portion of the June 2, 1993 letter, Inland's official position is not that
the company was consciously paralleling the downtime behavior of its competitors in order to
affect market prices, but rather that it was taking downtime because Inland had unacceptably high
levels of inventory.  See, e.g., Brown, July 5, 2007 Tr. at 103-13.  This position is confirmed by
Inland's White Paper to the FTC: "Stated most simply, each decision to take downtime was made
to reduce Inland's excessive inventories of linerboard and medium."  White Paper, Inland
030112.

Plaintiffs offer significant evidence that this rationale for downtime was pretextual.  First,
the June 2, 1993 letter concludes as follows: "although our need is to lower our inventories, this
move might also trigger other moves which could lower industry inventories and restore a better
supply/demand relationship sooner than is currently projected."  Id.  Second, in a memorandum
drafted between July 1, 1993 and July 7, 1993, Ted Owens, Vice President of Inland's
Containerboard Division, stated *inter alia* the following reasons for the downtime:

     (1)    "Industry inventory levels have remained at high levels . . . ."

---

     A.    Sure.  But it's peanuts.

Doughan Ark. Dep. 162:16-163:7; SCC 063588-647 at 629.

(2)     "Containerboard is a supply/demand driven industry" and the "problem has been

        primarily an oversupply problem."

(3)     "The present high inventories [in the industry] have caused severe price erosion

        for both liner and medium."

(4)     "Due to the continued price erosion, the containerboard industry is losing

        money . . . ."

Owens Letter, Inland 000640-41.

Inland's final decision to take market downtime was made some time between July 1,

1993 and July 7, 1993.[12]

On or about July 2, 1993, Beile of Stone contacted Inland as part of survey of producers.

Beile Dep. 1 at 162-63; Doney Dep. at 210-12.  Beile's task was to contact a number of

linerboard producers to "see how much [Stone] could get from each source of supply" in order to

make up for Stone's market downtime.  Beile Dep. 1 at 152.  Beile testified in his deposition that

he asked each company the following question: "If I have a need for containerboard, would you

have . . . any available?"  Id. at 158.  He never asked about grades or locations of containerboard,

id. at 441, as would be expected if Stone needed to fill box plant orders in certain geographic

areas.  Beile discussed prices with several alleged conspirators during this survey, as evinced by

his handwritten notes containing the prices at which each company offered to sell their

containerboard to Stone.  Handwritten Notes (July 2, 1993), SCC 007218.  The notes state that

Inland could sell Stone 15,000 tons per month from mid-July to mid-September at a price of

---

[12]  Inland's 30(b)(6) witness originally stated in deposition that the final decision was on
July 7, 1993.  Zimbelman Dep. 1 at 247.  He later testified that the final decision occurred
sometime between July 1, 1993 and July 7, 1993.  Id.

$280/ton.  Id.

Bart Doney, Vice President of Sales of Containerboard at Inland, reported this "very unusual" call to Owens, Vice President of Inland's Containerboard Division.  Doney FTC Tr. 12-14.  According to Doney, transactions such as this were "*normally based . . . upon the . . . published price, so it's very unusual to talk about market price or to bring that up.*"  Id. at 10-11 (emphasis added).

On July 6, 1993, James Doughan, executive vice president of Stone, called William Howes, the CEO of Inland.  According to Howes, in that July 6, 1993 telephone call, Doughan said that Stone planned to take 180,000 tons of downtime and was "trying to buy paper on the open market."  Howes Dep. 213-14.  This is confirmed by Howes' handwritten notes.  Handwritten Notes (July 6, 1993), Inland 025482.  Howes testified at his deposition that

> I wasn't comfortable with this call.  We had a well-defined anti-trust program at Inland that had the do's and don't's including not only complying with anti-trust laws as they were written, but also staying away from gray areas.  I don't know why Doughan called me.  I didn't ever have any transactions with him or anybody else selling linerboard.

Howes Dep. 213-14.  He continued, "I didn't think the phone call was appropriate.  We had very well-defined anti-trust guidelines . . . [i]ncluding not only living to the spirit of the antitrust laws, but also to stay away from gray areas."[13]  Id. at 219.

---

[13] In Temple-Inland Inc.'s and Gaylord Container Corporation's Motion to Strike Inadmissible Evidence (Document No. 925, filed June 8, 2007), defendants argue that the Court should not consider Inland's and Gaylord's internal antitrust compliance policies because "What matters in this case . . . is not whether Inland and Gaylord violated their own policies but, rather, whether they violated the antitrust laws.  It would be one thing if Inland's and Gaylord's policies tracked the antitrust laws.  But here, Inland and Gaylord fashioned policies that were much stricter than the antitrust laws."  Def.'s Evid. Mot. at 28.  The Court agrees that it should not look to these policies for the law upon which to base its decision.  The policies are relevant, however, as they relate to why Howes felt uncomfortable with communications with competitors.

32

Howes contemporaneously-written notes pertaining to this telephone conversation state "J. Doughan - Stone called from Canada to ask if we would sell them [linerboard] . . . . They are going to take 180,000 tons downtime?  I told him that I would talk to Bart Doney, that it was his decision . . . ."  Handwritten Notes (July 6, 1993), Inland 025482.  After discussing the negotiations with in-house counsel, Howes added a sentence to his handwritten notes, stating "I did not mention our decision which was made 7/1/93 to take downtime to adjust our very high inventories."  Id.; Howes Dep. 201-03.  Upon cursory inspection of the notes, it appears that Howes wrote this sentence contemporaneously; that is, the sentence is not specially marked or separated so as to indicate its later addition.  See Handwritten Notes (July 6, 1993), Inland 025482.  In fact, in deposition, Howes first testified that he added this sentence on July 6, 1993.  However, the second portion of the sentence, which is squeezed around a "7/7/93" date heading, tends to show that the sentence was in fact added after July 6, 1993.  See Handwritten Notes (July 6, 1993), Inland 025482.  Howes corrected himself after this fact was pointed out to him.  Howes Dep. 201-03.

On July 7, 1993, Inland issued a press release announcing its decision to take "unscheduled downtime at three of its linerboard mills in order to adjust inventories which are higher than established operating targets."  News Release, Inland Container Corp., Inland Container to Take Economic Downtime at Three of its Linerboard Mills (July 7, 1993), Inland 028434.  This was the first market downtime in Inland's forty-plus year history.  That same day, Stone announced its plan to take 180,000 tons worth downtime at six of its mills "for market-related purposes."  Stone Announces Market-Related Mill Downtime, Stone News July 7, 1993, SCC 019843.

33

**b.      Analysis**

In sum, Inland argues that it independently decided to take downtime by July 1, 1993,

prior to Beile's July 2, 1993 survey of producers and Doughan's July 6, 1993 call to Howes.

According to Inland, the purpose of this downtime was simply to reduce the company's excessive

inventories of linerboard and medium, and not to affect market prices.  Inland argues that

Howes's addition to his notes was appropriate, and that it does not suggest that any agreement

was discussed or reached during the conversation with Doughan and Howes.

The Court recognizes that this is one *plausible* explanation of the events leading up to the

unprecedented and contemporaneously announced downtime taken by Inland and Stone.  But

"Monsanto and Matsushita do not mean that antitrust defendants are entitled to summary

judgment merely by showing that there is a plausible explanation for their conduct; rather, the

focus must remain on the evidence proffered by the plaintiff and whether that evidence tends to

exclude the possibility that [the defendants] were acting independently."  InterVest, 340 F.3d at

160 (citation omitted).  "The Court did not hold [in Matsushita] that if the moving party

enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting

the actual market, it is entitled to summary judgment."  Eastman Kodak, 504 U.S. at 468.

The evidence against Inland "tends to exclude the possibility that the alleged conspirators

acted independently."  Matsushita, 475 U.S. at 588.  The facts of this case "strongly suggest-and

are 'not merely consistent with'-a price-fixing conspiracy."  In re OSB Antitrust Litig., 2007 WL

2253419, *3 (E.D. Pa. Aug. 30, 2007) (citing Twombly, 127 S.Ct. at 1965 (2007)).

Plaintiffs offer evidence that Inland's rationale for taking downtime was pretextual, i.e.,

that Inland was in fact taking downtime to affect market prices and not simply because their

internal inventory levels were too high.  Fragale, 760 F.2d at 474 (noting that pretextual explanations, "if believed by a jury, would disprove the likelihood of independent action").

This evidence of pretext is coupled with extensive "additional evidence of opportunity to conspire [and] other circumstantial evidence of restraint of trade." City of Moundridge, 429 F. Supp. 2d at 134.  Importantly, plaintiffs do not offer their evidence of opportunity to conspire in isolation.  See Petruzzi's, 998 F.2d at 1235 ("Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place.").  Rather, plaintiffs show that the communications between Inland and Stone were highly unusual, "inappropriate" even, and that market prices were discussed.

Furthermore, all of this evidence is contextualized within Stone's search for "a strategy to help this highly rational behavior [reducing inventory] become contagious in this industry . . . ." Memo from Roger Stone to Bill Laimbeer (May 26, 1993), SCC 032468.

Finally, while Twombly, 127 S.Ct. at 1964 makes clear that parallel conduct alone is insufficient to prove a price-fixing conspiracy, the simultaneous downtime announcements of Inland and Stone bolster plaintiffs' interconnected evidence of pretext, opportunity, and unusual behavior.  The Court notes that the simultaneous downtime announcements in this case constitute particularly strong circumstantial evidence because Inland's official position has been that its downtime decision was based on internal inventory levels rather than conscious parallelism.

Accordingly, the Court denies Inland's Motion for Summary Judgment with respect to the sufficiency of plaintiffs' evidence of conspiracy.

### 2.     Gaylord

#### a.     Facts

On December 8, 1992, Roger Stone and Gaylord CEO Marvin Pomerantz met privately in Pomerantz's Chicago condominium.  Chicago Condo Schedule, Gaylord 97487.  Both executives claim to have no memory of what they discussed at that December 1992 meeting.  Pomerantz Dep. I 42:22-43:6; Stone Dep. 172:21-173:3.  However, Stone testified that "Mr. Pomerantz and I discussed only those things that we thought were appropriate, and I think we both had a very high sensitivity about those things that we didn't think were appropriate."  Stone Dep. 176.

On December 10, 1992, Roger Stone wrote an internal memorandum stating that he had "given up on a 'pump priming' increase" and that he thought he would be unable to "get the mental set of the industry conditioned" for a price increase.  Memo from Roger Stone to Arnold Brookstone et al. distribution (Dec. 10, 1992), SCC 0032270.

On May 25, 1993, Roger Stone again met privately with Pomerantz at Pomerantz's condominium.  Chicago Condo Schedule, Gaylord 97487.  Pomerantz and Stone testified in deposition that they had no recollection of what they discussed during this meeting.  Pomerantz Dep. I. 44; Stone Dep. 170-72; 549-50.

On May 26, 1993, Roger Stone drafted a memorandum, previously set forth in greater detail by the Court, that stated he would "obviously prefer industry players taking downtime to *reduce inventory overhang*. . . . If you have a strategy to help this highly rational behavior become contagious in this industry, I would dearly like to hear it."  Memo from Roger Stone to Bill Laimbeer (May 26, 1993), SCC 032468 (emphasis added).

Similarly, in an undated May report to Gaylord's board of directors, Pomerantz stated as follows:

> Currently, inventories are at 2.9 million tons, or roughly 400,000 tons above the 2.5 million ton level that is historically associated with price increases.  These 400,000 tons

36

represent less than one week of production.  Operating rates have consistently been in the high 90 percent range with mills running flat out and nobody taking market downtime. Despite current inventory levels, we are very optimistic about a near-term pricing "turnaround." . . . *What we have is an inventory overhang.*

GCR Update (May 1993), GCC 0886-89 at 86.

Sometime in June 1993--Gaylord cannot say precisely when--Pomerantz decided to take downtime on the Number Six machine at Gaylord's Bogalusa mill.  See Pomerantz Dep. I at 196; Sept. 25, 1996 Testimony of Robert Bruce Grimm 78, Gaylord 097287-434 at 365.  No written business analyses relating to this market downtime exists.   Ralph Kersten Dep. at 172, Gaylord Container Corp.'s Supplemental Responses and Objections to Direct Action Plaintiffs' Interrogatories Directed to Gaylord Container Corp. (Aug. 21, 2006), No. 1.

Pomerantz testified as follows with respect to his decision to take market downtime at the Bogalusa Mill:

> Q.    Do you recall making the decision to take downtime at this particular mill . . . ?
>
> A.    . . . [The Number Six machine] produced 80 tons a day, maybe 100.  This is so inconsequential, this is de minimis.  This doesn't mean anything We put in a new machine, a $100 million investment, produced 1,200 tons a day. This machine made 80. While this machine was going down [in mid-1993], the new machine was coming up. We didn't have enough orders to run this machine on an efficient basis at a high cost basis, at a loss basis, and to run this and the new machine, to put it in simple terms, so, yeah, I gave the final okay to shut the machine down and I would do it again today.

Pomerantz Dep. I 196-97.

Plaintiffs point out several problems with Pomerantz's explanation for his decision.  First, plaintiffs note that there was no new machine added in mid-1993; the newest machine at Bogalusa was operating approximately three years before Pomerantz made the decision to take market downtime.  Kersten Dep. at 173-74.  Second, plaintiffs point out that if the "costs of

37

operating the machine were truly exorbitant, Gaylord would not have restarted the machine after

shutting it down . . .  because neither prices nor production costs changed appreciably during that

time."  Counterstatement ¶ 138.  Third, plaintiffs note that Pomerantz testified that he publicly

announced the market downtime because it could affect Gaylord's deliveries to customers, which

conflicted with his testimony that Gaylord had "no orders" for the output of the machine and

Gaylord's public assurance that the market downtime would "not affect the timeliness of

deliveries" to customers.  Id. ¶ 140.

On June 25, 1993, Gaylord publicly announced that it took the market downtime "to

reflect current market conditions, including inventory levels."  News Release, Gaylord Container

Corp., Gaylord Takes Market Down Time at Bogalusa Mill (June 25, 1993), Gaylord 057438.

In July 1993, Gaylord took twenty-four days of downtime on the Number Six machine at

the Bogalusa mill.  In August 1993, Gaylord took twenty-one days of downtime on the Number

Six machine at the Bogalusa mill.  Counterstatement ¶ 138.   In contrast, Gaylord took only one

brief episode of market downtime in the 10 years prior to the market downtime at issue in this

case.  Marshall Rpt. ¶ 314.  Indeed, Gaylord's "overall strategy" was "no mill downtime.  It's a

mantra of the company."  Stahl Dep. 255.

In a November letter to Gaylord's board of directors, "[t]he key to the price increase [in

the linerboard market] was bringing inventories under control.  As reported to you previously,

market-related down time taken by a number of companies, including Gaylord, was instrumental

in reducing inventories."  GCR Update (Nov. 1993), GCC 1130-33, at 30.

### b.    Analysis

In sum, Gaylord argues that it made an independent business decision to shut down the

38

Number Six machine at the Bogalusa mill because the Number Six was the company's least efficient and profitable machine, there were low (or no) orders for the machine, and the company was trying to cope with swelling inventories.  See Gaylord Mot. at 71.

Again, although this is one *plausible* explanation of the events leading up to the downtime taken on the Number Six machine, "Monsanto and Matsushita do not mean that antitrust defendants are entitled to summary judgment merely by showing that there is a plausible explanation for their conduct; rather, the focus must remain on the evidence proffered by the plaintiff and whether that evidence tends to exclude the possibility that [the defendants] were acting independently."  InterVest, 340 F.3d at 160 (citation omitted).

The evidence against Gaylord "tends to exclude the possibility that the alleged conspirators acted independently."  Matsushita, 475 U.S. at 588.  Plaintiffs offer abundant evidence that Pomerantz's explanation for taking downtime on the Number Six machine was pretextual.  For example, Pomerantz said that the downtime was "inconsequential" and "de minimis," but a letter to Gaylord's board of directors stated that the "down time taken by a number of companies, including Gaylord, was instrumental in reducing inventories," which was the "key to the price increase . . . ."  Compare Pomerantz Dep. I 196-97 with GCR Update (Nov. 1993), GCC 1130-33 at 30.  Fragale, 760 F.2d at 474 (noting that pretextual explanations, "if believed by a jury, would disprove the likelihood of independent action").

As with Inland, the pretext evidence pertaining to Gaylord is coupled with extensive "additional evidence of opportunity to conspire [and] other circumstantial evidence of restraint of trade."  City of Moundridge, 429 F. Supp. 2d at 134.  For example, plaintiffs show undocumented meetings between Roger Stone and Pomerantz occurring at crucial times.  An

undocumented social meeting between executives of competing companies does not alone tend

to exclude independent action.  See In re Baby Food Antitrust Litig. 166 F.3d at 133 ("Company

personnel do not often operate in a vacuum or 'plastic bubble'; they sometimes engage in the

longstanding tradition of social discourse.").   In this case, however, the relevant meeting

occurred at approximately the same time as the circulation of internal memoranda at Gaylord and

Stone that discussed pricing turnarounds and strategies for reducing industry inventory

"overhangs."  Indeed, the Stone memorandum made clear that Stone was searching for "a

strategy to help this highly rational behavior [reducing inventory] become contagious in this

industry . . . ."  Memo from Roger Stone to Bill Laimbeer (May 26, 1993), SCC 032468.

     The parallel downtime in this case again bolsters plaintiffs' interconnected evidence of

pretext, opportunity, and unusual behavior.  As was the case with respect to Inland, Gaylord's

position has been that it its downtime decision was based on internal inventory levels, rather than

conscious parallelism.  Gaylord Mot. Summ. J. at 67 ("Gaylord took market downtime in light of

its *own* internal situation.").

     The Court notes that Gaylord argues that it could not have conspired to take downtime

because "Gaylord actually set a production record in 1993 and 1994, hardly the act of a

conspirator who was looking to restrict supply."  Brown, July 5, 2007 Tr. at 135.  The Court

disagrees.  The fact that Gaylord's overall productivity was increasing at this time does not bear

on whether or not the company conspired to take downtime.  Taking downtime on the Number

Six machine would have nevertheless contributed to a reduction in industry-wide inventory

overhang.  Regardless of the productivity of Gaylord's other machines, taking downtime on the

Number Six machine reduced Gaylord's overall inventories by same amount.

Accordingly, the Court denies Gaylord's Motion for Summary Judgment with respect to the sufficiency of plaintiffs' evidence of conspiracy.

## V.   DISCUSSION: OPPORTUNITY COST

Defendants argue that the inclusion of "lost opportunity cost" in plaintiffs' damages claim "is nothing more than a disguised attempt to seek impermissible prejudgement interest."  Inland Mot. at 80; Gaylord Mot. at 72.  Plaintiffs argue that opportunity cost and prejudgment interest are distinguishable.  See Opp. at 101.  This Court rules that recoupment of opportunity cost damages is equivalent to recovery of prejudgment interest, and thus, a plaintiff may not obtain opportunity cost damages in an antitrust action absent a justification for awarding prejudgment interest under 15 U.S.C. § 15(a).

### A.   Facts

Incorporation of opportunity cost increases plaintiffs' alleged damages by $118.7 million. Plaintiffs' damages expert, Professor Halbert L. White, calculated that

> overcharges from Temple-Inland and Gaylord for all purchases for the plaintiffs were $109.4 million during the damages period.  These overcharges are expressed in nominal terms and do not reflect the opportunity costs resulting from the fact that the defendants' overcharges deprived purchasers of the use of capital for their development and growth.

White Rpt. ¶¶ 183-84.  According to Professor White,

> Opportunity costs were incurred from the point in time at which each affected transaction occurred, and these costs will continue to accrue until plaintiffs receive compensation for damages.  Including opportunity cost is a standard procedure in damage analysis and reflects a fundamental principal of economics and finance.

Id. ¶ 184.

Professor White calculated the opportunity cost associated with plaintiffs' lost use of funds by computing present value.  Id. ¶ 185.  Applying the U.S. bank prime loan rate (averaging

41

seven percent from 1993 to August 2006), Professor White determined that "the present value of plaintiffs' damages . . . . associated with purchases from Temple-Inland and Gaylord totals $228.1 million during the damage period."  Id.  According to Professor White, this figure "represents the total payments required to restore the plaintiffs to the same financial position that they would have enjoyed but for the defendants' alleged illegal cartel."  Id.

**B.      Standard of Review**

"Section 4 of the Clayton Act sets out the amount of recovery and prejudgment interest allowed in antitrust cases."[14]  Qureshi v. R.J. Reynolds Tobacco Co., 2006 WL 3500607, *2

---

[14]  Specifically, Section 4 of the Clayton Act provides that

Whenever the United States is hereafter injured in its business or property by reason of anything forbidden in the antitrust laws it . . . shall recover threefold the damages by it sustained and the cost of suit. The court may award under this section, pursuant to a motion by the United States promptly made, simple interest on actual damages for the period beginning on the date of service of the pleading of the United States setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only--

(1) whether the United States or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay or otherwise acted in bad faith;
(2) whether, in the course of the action involved, the United States or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings;
(3) whether the United States or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof; and
(4) whether the award of such interest is necessary to compensate the United States adequately for the injury sustained by the United States.

15 U.S.C. § 15(a).

(E.D.Mich. Dec. 1, 2006) (citing 15 U.S.C. § 15(a)).  Under that section, a plaintiff in a private antitrust action cannot recover prejudgment interest unless the opposing party acted in bad faith. 15 U.S.C. § 15(a); <u>Masters v. Wilhelmina Model Agency, Inc.</u>, 473 F.3d 423, 436 (2d Cir. 2007) (noting that "the Clayton Act does not allow for prejudgment interest in the absence of a finding of bad faith on the part of defendants causing a material delay in the adjudication of the dispute") (citing 15 U.S.C. § 15(a)); <u>see also</u> <u>Fishman v. Estate of Wirtz</u>, 807 F.2d 520, 561 (7th Cir. 1986) (citing 15 U.S.C. § 15(a)).

### C.    Analysis

Plaintiffs do not argue that they are entitled to prejudgment interest; rather, they argue that opportunity cost is distinguishable from prejudgment interest.  The Court disagrees.  A "plaintiff cannot circumvent the general rule by engaging in semantic subterfuge."  <u>Pacific Gas and Electric Co. v. Howard P. Foley Co., Inc.</u>, 1993 WL 299219, *2 (N.D. Cal. July 27, 1993) (citing <u>Library of Congress v. Shaw</u>, 478 U.S. 310, 321-22 (1986) (noting that "the force of the no-interest rule cannot be avoided simply by devising a new name for an old institution")).

The Third Circuit's discussion of prejudgment interest in <u>Trio Process Corp. v. L. Goldstein's Sons, Inc.</u>, 638 F.2d 661, 663 (3d Cir. 1981) addresses this issue even though the opinion does not explicitly use the term "opportunity cost."

> Where remedial damages measure the loss incurred by plaintiff as of the time of the infringement, the award of prejudgment interest further serves a remedial purpose by making the plaintiff whole for *the intervening loss of use of the money he would have had* at the date of infringement, but for the defendant's unlawful acts. Under some statutory damage-enhancement schemes, however, such as section 4 of the Clayton Act, 15 U.S.C. § 15, the award of multiple damages is designed to take the place of this interest loss, along with all other remedial and punitive factors necessary to vindicate the policies

of the underlying substantive law.[15]

Trio Process, 638 F.2d at 663 (emphasis added).  The Third Circuit describes "prejudgment

interest" as "making the plaintiff whole for the intervening loss of use of the money he would

have had at the date of infringement, but for the defendant's unlawful acts."  Id.  Professor White

describes "opportunity cost" in the same way: the cost to make the plaintiff whole for the

intervening loss of "use of capital" plaintiffs would have had  "from the point in time at which

each affected transaction occurred . . . but for the defendants' alleged illegal cartel."  Compare id.

with White Rpt. ¶¶ 183-85.  In short, the Third Circuit and Professor White are referring to the

same concept using different terminology.[16]

        In In re Lower Lake Erie Iron Ore Antitrust Litigation, 759 F. Supp. 219 (E.D. Pa. 1991),

---

        [15] Consistent with this description, the Supreme Court later explained in West Virginia v.
United States, 479 U.S. 305 (1987) that "[p]rejudgment interest serves to compensate for the *loss
of use of money* due as damages from the time the claim accrues until judgment is entered,
thereby achieving full compensation for the injury those damages are intended to redress."  Id. at
310 n.2 (emphasis added).

        [16] The Court notes that Professor White calculated the opportunity cost associated with
plaintiffs' lost use of funds by computing "present value" through an interest calculation.  White
Rpt. ¶ 185.  In Poleto v. Consolidated Rail Corp., 826 F.2d 1270 (3d Cir. 1987), abrogated on
other grounds, Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827 (1990), the Third
Circuit noted that prejudgment interest "represents past economic loss . . . properly adjusted to
present value through an interest calculation."  826 F.2d at 1278 n.14.  See also Robinson v.
Fetterman, 387 F. Supp. 2d 483, 485 (E.D. Pa. 2005) (citing Poleto, 826 F.2d at 1278 n.14).

        The difference between "present value" damages and pre-judgment interest is one of
terminology rather than substance.  See also Philip E. Areeda & Herbert Hovenkamp, Antitrust
Law: An Analysis of Antitrust Principles and Their Application ¶ 392a, at 493-94 (2d. ed. 2003)
(noting that a present value damage award "may seem fair" but "is nonetheless equivalent to an
award of pre-judgment interest") (hereinafter Areeda & Hovenkamp).

        In contrast, the mere fact that "damage[s] can be computed in terms of 'interest' does not
make it impermissible prejudgment interest."  Pacific Gas and Electric Co., 1993 WL 299219,
at *4.

44

aff'd in part, rev'd in part on different grounds, 998 F.2d 1144 (3d Cir. 1993), a district court in

this circuit came to the same conclusion:

> [P]laintiffs sought to recover, in addition to claimed lost profits, damages which they
> described as "opportunity costs" damages. Their economic experts testified . . . that the
> defendant's conspiracy caused them to lose, not only the profits they would have earned
> handling or hauling pelletized iron ore, but also the additional economic benefits they
> could have reaped by investing those profits over the years. The jury rejected these
> additional claims, and these plaintiffs now seek judgment n.o.v. or a new trial on that
> issue.
>
> Notwithstanding the terminology employed by the witnesses in describing these claims, I
> . . . remain unpersuaded, of any meaningful distinction between such claims and a claim
> for pre-judgment interest. Although I agreed to submit the issues to the jury, primarily as
> a precautionary measure, I advised counsel at the time that, in my opinion, no such award
> could be permitted to stand.

Id. at 235.

Additionally, a number of courts in other circuits have implicitly recognized that

prejudgment interest and opportunity cost are conceptually akin.  See, e.g., Trustees of Flint

Michigan Laborers' Pension Fund v. In-Puls Const. Co., 835 F. Supp. 972, 976 (E.D. Mich.

1993) (noting "the purpose of prejudgment interest is to compensate for lost opportunity cost");

InterDigital Comm. Corp. v. Nokia Corp. 407 F. Supp. 2d 522, 535 (S.D.N.Y. 2005) (noting

"[p]rejudgment interest is necessary to compensate . . . for the opportunity cost"); Chao v. Kropf,

2007 WL 2025779, *2 (W.D. Mich. July 9, 2007) (noting plaintiff "is seeking damages for lost

opportunity costs in the form of prejudgment interest"); Cayuga Indian Nation of New York v.

Pataki, 165 F. Supp. 2d 266, 359 (N.D.N.Y. 2001) (noting prejudgment interest " takes into

account . . . lost opportunity cost"); Chamberlain v. United States, 401 F.3d 335, 344 (5th Cir.

2005) (noting "prejudgment interest is more naturally associated with . . . opportunity cost");

Borden, Inc. v. F.E.R.C., 855 F.2d 254, 266 (5th Cir. 1988); Fingerhut Bus. Servs., Inc. v. Etoys

Inc., 2001 WL 1640075, *4 (D. Minn. Sep. 6, 2001) (noting prejudgment interest was

appropriate "because otherwise FBSI would have lost the opportunity costs"); see also John C.

Keir & Robin C. Keir, Opportunity Cost: A Measure of Prejudgment Interest, 39 Bus. Law. 129

(1983) (cited in Shepherd Oil, Inc. v. Atlantic Richfield Co., 734 F.2d 23, 34 (Em. App. 1984));

cf. JGR, Inc. v. Thomasville Furniture Indus., Inc. 2007 WL 275967, *4-5 (N.D. Ohio Jan. 26,

2007) (noting "opportunity cost damages are not completely identical with prejudgment interest"

but " do serve the same purpose" and "any additional award of prejudgment interest would

overcompensate").

     Plaintiffs cite several cases that conclude otherwise.  See Multiflex v. Samuel Moore &

Co., 709 F.2d 980, 987-88 (5th Cir. 1983), disavowed on other grounds, Deauville Corp. v.

Federated Dept. Stores, 756 F.2d 1183 (5th Cir.1985); Concord Boat Corp. v. Brunswick Corp.,

21 F. Supp. 2d 923, 935-36 (E.D. Ark. 1998), rev'd on other grounds, 207 F.3d 1039

(8th Cir. 2000); Law v. Nat'l Collegiate Athletic Ass'n, 185 F.R.D. 324, 345 (D. Kan. 1999).

For example, the Court in Multiflex held as follows:

> [T]he expert adjusted the damage estimates to create a net present value for the previous
> injury. Expressing a past damage figure in present terms required an estimation of the lost
> opportunity cost of the capital. The estimate normally equals the interest that might have
> been earned on the funds if placed in alternative investments. . . . [Defendant] claims that
> these projections amount to nothing more than prejudgment interest, which normally
> would not be recoverable in this antitrust action. . . . [W]e find that the claims were made
> to reflect what the asserted lost profits would have earned in an open investment market,
> not as a statutory claim for prejudgment interest. Since the claim was based on an
> economic theory and not in a claim to statutory or common law prejudgment interest, we
> find no error in this portion of the award.

709 F.2d 980, 996-97 (5th Cir. 1983) (citations omitted).

The Court agrees with Areeda & Hovenkamp that these cases were decided erroneously,[17] and in any event, it is not bound by them.  Accordingly, the Court grants Inland's and Gaylord's Motions for Summary Judgment as to plaintiffs' claimed damages for opportunity cost.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment With Respect to Statutes of Limitations is granted.  Defendant Temple-Inland Inc.'s Motion for Summary Judgment and Defendant Gaylord Container Corporation's Motion for Summary Judgment are each granted in part and denied in part.  Specifically, the Court denies defendants' Motions for Summary Judgment with respect to the sufficiency of plaintiffs' offer of conspiracy evidence and grants defendants' Motions for Summary Judgment with respect to plaintiffs' claims for opportunity cost damages.

An appropriate order follows.

---

[17] Areeda & Hovenkamp explains that the "prohibition of pre-judgment interest as a matter of course provides an incentive to disguise prejudgment interest as something else." Philip E. Areeda & Herbert Hovenkamp ¶ 392a, at 493-94.  Multiflex, 709 F.2d at 987 is "a case in which '[t]he court seems to have been misled by the fact that the plaintiff made an economic argument rather than a transparent claim for statutory or common law prejudgment interest.  This would seem to be an error.'"  Def.'s Rep. at 43 n.32 (quoting Areeda & Hovenkamp ¶ 392a, at 494).

47

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE LINERBOARD ANTITRUST LITIGATION | ) ) ) | MDL No. 1261 |
| THIS DOCUMENT RELATES TO: | ) ) ) ) | |
| Procter & Gamble Company, et al. v. Stone Container Corporation, et al. | ) ) | **Case No. 03C-3944 (N.D. Ill.)** |
| Mars, Inc., et al. v. Stone Container Corporation, et al. | ) ) ) | **Case No. 03C-6977 (N.D. Ill.)** |
| Perdue Farms, Inc. v. Stone Container Corporation, et al. | ) ) ) ) | **Case No. 03-CV-1702 (D. Md.)** |

<u>**ORDER**</u>

**AND NOW**, this 30th day of August, 2007, upon consideration of Defendant Temple-Inland Inc.'s Motion for Summary Judgment (Document No. 894, filed March 28, 2007); Defendant Gaylord Container Corporation's Motion for Summary Judgment (Document No. 895, filed March 28, 2007); Defendants' Motion for Summary Judgment With Respect to Statutes of Limitations (Document No. 896, filed March 28, 2007); Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Document No. 905, filed May 14, 2007); Plaintiffs' Joint Counterstatement of Facts in Opposition to Defendants' Motions for Summary Judgment (Document No. 906, filed May 14, 2007); Plaintiffs' Separate Statement of Disputed Facts and Evidentiary Objections (Document No. 904, filed May 14, 2007); Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment

48

(Document No. 905, filed May 14, 2007); Defendants' Joint Reply Memorandum in Further

Support of Their Motions for Summary Judgment (Document No. 927, filed June 8, 2007);

Reply Brief in Support of Defendant Temple-Inland Inc.'s Motion for Summary Judgment

(Document No. 928, filed June 8, 2007); Reply in Support of Defendant Gaylord Container

Corporation's Motion for Summary Judgment (Document No. 929, file June 8, 2007);

Defendants' Reply Memorandum of Law in Support of Defendants' Motion For Summary

Judgment With Respect to Statutes of Limitations (Document No. 930, filed June 8, 2007);

Defendants' Joint Response to Plaintiffs' Separate Statement of "Disputed Facts" (Document No.

926, filed June 8, 2007); and Plaintiffs' Memorandum Regarding Bell Atlantic v. Twombly

(Document No. 934, filed June 18, 2007), following oral arguments on July 5, 2007 and July 6,

2007, for the reasons set forth in the attached Memorandum, **IT IS ORDERED THAT**

Defendants' Motion for Summary Judgment With Respect to Statutes of Limitations (Document

No. 896, filed March 28, 2007) is **GRANTED**.  Plaintiffs' state and federal claims based on

purchases made between December 1, 1995 and May 1997 are **DISMISSED** on the ground that

they are barred by the applicable statutes of limitations.

     **IT IS FURTHER ORDERED THAT** Defendant Temple-Inland Inc.'s Motion for

Summary Judgment (Document No. 894, filed March 28, 2007) and Defendant Gaylord

Container Corporation's Motion for Summary Judgment (Document No. 895, filed March 28,

2007) are **GRANTED IN PART AND DENIED IN PART**, as follows:

     1.  Defendant Temple-Inland Inc.'s Motion for Summary Judgment and Defendant

Gaylord Container Corporation's Motion for Summary Judgment are **DENIED** with respect to

the sufficiency of plaintiffs' evidence of conspiracy on the ground that the evidence tends to

exclude the possibility that the alleged conspirators acted independently.

2.  Defendant Temple-Inland Inc.'s Motion for Summary Judgment and Defendant Gaylord Container Corporation's Motion for Summary Judgment are **GRANTED** with respect to plaintiffs' claimed "opportunity cost" damages on the ground that recoupment of opportunity cost damages is equivalent to recovery of prejudgment interest, which is not warranted in this case under 15 U.S.C. § 15(a).

**BY THE COURT:**

**/s/ JAN E. DUBOIS, J.**

_____

**JAN E. DUBOIS, J.**